2025 IL App (1st) 221202
No. 1-22-1202
Opinion filed July 11, 2025

Sixth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 13516 |
| | ) | |
| TAJUAN MURRY | ) | The Honorable |
| | ) | Pamela Lemming and |
| Defendant-Appellant. | ) | Gregory Paul Vasquez, |
| | | Judges, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice C.A. Walker concurred in the judgment and opinion.
Presiding Justice Tailor concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Murry appeals from his first degree murder conviction and an 80-year sentence. He argues

that the trial court made several errors: (i) granting the State an extension to the speedy trial term,

(ii) failing to properly admonish prospective jurors under Illinois Supreme Court Rule 431(b) (eff.

July 1, 2012), (iii) allowing the State to use leading questions and a witness's prior statements,

(iv) admitting autopsy photos, and (v) imposing an unduly long sentence on improper bases. We

agree with one of his sentencing claims, so we reverse and remand for a new sentencing hearing.

¶ 2 Background

¶ 3 The State charged Tajuan Murry with the shooting death of Marty Burtin Jr. Before trial, the State offered Murry a plea deal of a six-year sentence in exchange for a guilty plea to aggravated battery with a firearm. Murry declined the offer. The State also requested and received an extension to the 120-day speedy trial term, citing its inability to locate a key witness, Murry's brother Cameron Charles. Ultimately, a jury found Murry guilty of first degree murder, and the trial court sentenced him to 80 years in prison.

¶ 4 *Pretrial Proceedings*

¶ 5 Murry remained in custody following his arrest two days after the shooting. Over the next week, he filed two demands for trial and, in January and February 2019, three additional demands. On each occasion, the State requested and received a continuance. On March 18, 2019, the State requested another continuance to March 22, 2019.

¶ 6 On that date, the State filed a petition for an extension of time. The State asserted that, from November 2018 to March 2019, its investigator had repeatedly attempted to locate and secure the presence of a material witness, Murry's brother, Cameron Charles. The investigator made visits to Charles's former addresses and contacted his parole officer, former employer, former girlfriend, family members, other witnesses in the case, and police agencies in Wisconsin but was unable to find him. Only on March 18, 2019, did the State learn that Charles was in custody in a Wisconsin jail. After serving a subpoena on Charles, the State requested a 60-day extension to the speedy trial term.

¶ 7 Murry objected, arguing the State had not exercised due diligence in trying to locate Charles. The State countered that its investigator had made numerous efforts, including traveling to Wisconsin and contacting the Green Bay Police Department. The State also noted that Charles

had an active Wisconsin arrest warrant from September 10, 2018, until March 17, 2019, and that the Green Bay Police Department had also been unsuccessful in locating him.

¶ 8 The trial court granted the State an extension of time. It also issued a certificate to a judge in Wisconsin, designating Charles a necessary and material witness and compelling his testimony at trial.

¶ 9 *Voir Dire*

¶ 10 During *voir dire*, the court asked prospective jurors individually about the principles in Rule 431(b). For the first three— presumption of innocence, the burden of proof, and the defendant's right not to present evidence —the court asked, "Do you agree with this rule of law?" All prospective jurors responded affirmatively. The court also informed them that "the defendant is not required to testify" and asked if they "would hold the fact that defendant did not testify at trial against the defendant." All confirmed that they would not. No party objected to the method of questioning. The trial began the next day.

¶ 11 *Trial*

¶ 12 Teresa Burtin testified that around 1 a.m. on August 4, 2016, she woke up to gunshots. She then heard a bang on her door and opened it to find Brittney Thomas saying her son Marty Burtin Jr. had been shot. She saw Burtin lying in the street.

¶ 13 Burtin's landlord, Raymond Farries, testified that the apartment complex had six surveillance cameras functioning properly at the front, side, and back of the property. The cameras had motion sensors and recorded in color when there was bright light but in black and white otherwise. Farries admitted that he did not regularly check the surveillance camera videos, adding that the cameras were "fairly new" and that "the last time [he] checked them, they were [accurate]."

The jury viewed clips of the surveillance video footage, which spanned from 12:36 a.m. to 12:59 a.m.

¶ 14    Brittney Thomas testified that, on the evening of August 3, 2016, she attended a party with her husband, Abdullah Lowery; her brother-in-law, Lathan Lowery; and her children. Thomas drove her van. Burtin was at the party. Later, Thomas, Abdullah, Lathan, and Burtin drove home together.

¶ 15    Thomas parked her car on Warren Avenue and remained inside, using her phone while Abdullah, Lathan, and Burtin got out. Lathan climbed into his mother-in-law's van, which was parked a few cars behind Thomas's van. Meanwhile, Abdullah and Burtin approached Charles Cameron, who was standing in a nearby doorway. After a brief conversation, Charles went inside the building, and Abdullah and Burtin walked back toward Thomas's van.

¶ 16    While Abdullah and Burtin stood outside the van, Thomas suddenly heard gunfire and saw a man with short "cheek level" dreadlocks, dressed in dark clothing, firing a weapon. She could not further describe the shooter's clothing or identify his race because "[e]verything was black." She got out of the van and ran to her house, which was across the street from the apartment complex where she had parked. After the gunfire stopped, Thomas stood on her front porch and saw someone running over the lawn of the complex and toward the back of the building. Shortly after, she spotted a car driving away from the rear of the building.

¶ 17    Later that day, Thomas viewed a photo array but could not identify anyone as the shooter. Two days later, she viewed a lineup but again failed to identify anyone as the shooter.

¶ 18    Thomas's husband, Abdullah, recounted their return from the party and walking with Burtin to talk with Charles, who was by the entrance to his apartment building. The State asked Abdullah if he "ma[d]e any observations about Cameron Charles at that time," to which Abdullah

replied that Charles was "acting strange when [Burtin] was asking him a question. He would look down, then look up at [Burtin] like he knew something was going to happen." Defense counsel objected, and the court sustained the objection.

¶ 19    The State then inquired, "When you had been around *** Charles prior to this [date] is he usually a quiet guy, or is he a little bit talkative, or somewhere in the middle?" Defense counsel objected again, but the court overruled the objection. Abdullah said Charles was usually "talkative," and the State asked if it would be "fair to say that's one of the things that you found a little bit strange, *** that [Charles] wasn't really talking?" Abdullah responded, "Right." Once more, defense counsel objected, and the court overruled his objection. Abdullah, Thomas, and Burtin conversed for two to three minutes.

¶ 20    After they spoke, as Abdullah and Burtin stood by the van, a man wearing a black hoodie and black pants, brandishing a firearm, approached them and said, "What's up now n***?" When Abdullah saw the gun, he started running and heard at least five shots. He could not describe the gun. He took cover behind a garage in the alley until the police arrived.

¶ 21    When Abdullah returned, he saw Burtin lying in the street. Charles was looking out his window on the second floor, asking what happened. After Abdullah informed him Burtin had been shot, Charles came outside to look and went back upstairs. Abdullah remained outside and spoke with police. Later, he viewed a photo array and a lineup but was unable to make an identification. He admitted on cross-examination that he had smoked marijuana and was drunk on the night of the shooting.

¶ 22    Cameron Charles testified that until recently he had been in custody in Oconto, Wisconsin, and currently held at the Cook County jail. He stated that he had not been offered or promised anything in exchange for his testimony. He identified Murry as his brother.

¶ 23    Charles had lived in the apartment complex with family and was friends with Burtin. On the day of the shooting, Charles and Murry drove around together in a silver car for about an hour. When the State asked him if he "s[aw] that his brother had a gun with him," Charles testified Murry had a black gun and did not know what kind it was. Eventually, Murry dropped Charles off at the apartment complex. Charles recalled that the weather was hot.

¶ 24    The State asked whether "[his] brother came back over" that day and "arrive[d] there at about 10:00 o'clock at night or thereabouts." Charles confirmed that he did. Defense counsel did not object to the State's line of questioning. They went to the liquor store with Charles's nephew, bought a pint of liquor, and returned to the apartment complex, where they played music and talked. Charles "smoked a blunt," and Murry drank.

¶ 25    The State then asked Charles about Murry's clothing and gun.

"Q.    Now, when your brother came over that night, did he have a hoodie with him?

A.    Yes.

Q.    And what color was the hoodie?

A.    I think it was black."

The State next asked:

"Q.    Was it perhaps black and red?

A.    I can't remember if it was red, but I remember it was black.

Q.    You remember it was black. Okay. And, while you were hanging out with your brother at the apartment, did you again see him in possession of a gun?

A.    Yes.

Q.    And what color was that gun?

A.     Black."

Defense counsel made no objections to these questions.

¶ 26     When Murry left that evening, Charles walked him out. The State asked, "at around 12:42 in the morning were you standing outside with your brother *** ?" Charles confirmed that he was. Defense counsel did not object. Charles testified that he was hanging out with Murry, smoking a cigarette, and that a girl he did not know pulled up driving a red Impala.

¶ 27     Again, the State asked about Murry's clothing.

"Q.     Now, when you and your brother were standing outside you already said that he had a black hoodie; is that right?

A.     Right.

Q.     At that time did [Murry] also have leather gloves?

A.     He had gloves. I don't know if they were leather.

Q.     You don't remember if they were leather?

A.     I just don't know if they were leather or regular gloves.

Q.     Okay. Fair enough. While you guys were standing outside waiting for his ride, did you see him put the gloves on?

A.     No.

Q.     Is that no, or I don't remember?

A.     I don't think he put the gloves on."

Defense counsel did not object to this line of questioning.

¶ 28     Before getting into the car on the driver's side, Murry put the black gun on his waist. After Murry drove away, a van pulled up and parked along the street by the apartment complex. Charles,

standing in his doorway, saw Burtin and Abdullah, whom he knew as "Buci." He, Burtin, and Buci spoke for a few minutes. The State asked:

"Q:    Now while you were talking to [Burtin] and Buci, is it fair to say that your brother was still in the car that was parked across the way?

A:     Yeah.

Q:     And, while he was sitting in the car that was parked across the way on Warren, did you get a phone call from him at some point?

A:     I don't know if it was a phone call or text."

Defense counsel did not object. Burtin and Buci soon walked back toward the van.

¶ 29    Charles went back inside and, around 1 a.m., heard five to seven gunshots. He looked outside and saw an ambulance approaching. Through his window, he asked Buci what had happened and learned that Burtin had been shot. Outside, he talked to Buci and Buci's brother but soon went back inside. He did not speak to the police. Around 1:20 a.m., Murry called, and they spoke for a few minutes. He said it was "possible" he called Murry to check on him. They spoke again 30 minutes to an hour later.

¶ 30    Charles identified himself and Murry in some of the surveillance videos. In one clip, Murry wore the same black hoodie that he had on earlier that day, although it looked black and white in the video. Charles also recognized Burtin and Buci in the video and stated that around 12:53 a.m., they approached him as he stood in the doorway of his apartment building. At that time, Murry was still sitting in the driver's seat of the car parked across the street. When shown another video depicting a car pulling into the alley behind the apartment building at 12:56 a.m., Charles said the car "looks like the same car [Murry] was in." But, when shown a third clip, which was stopped at 12:58 a.m., Charles said he could not recognize the person. The State asked Charles if the person

in the third clip was "wearing the same sweatshirt" Murry was wearing when they stood and talked in front of the building. Charles replied, "From what I remember the hoodie was all black. It looked like — I don't know what this patch [on the hoodie pictured in the video] is right here."

¶ 31 Charles admitted that he participated in several interrogations starting the morning after Burtin was killed and continuing over a 48-hour period while he was detained. During the first interrogation, the detectives showed him pictures of himself and Murry standing in front of the building. The detectives asked who the person in the photograph was, and Charles "told them that was [his] brother." When the State asked Charles if it was "difficult for [him] to tell the detectives what it is that [he] knew about his brother," defense counsel objected, and the court sustained the objection. After the State rephrased its question, Charles said he felt "heartbroken" about having to tell detectives what he knew because "[t]hat's [his] little brother." He admitted that when he first spoke with detectives, he was not forthcoming. It wasn't until they showed him the video of him and Murry in front of the apartment building that he shared what he knew.

¶ 32 When Charles spoke with detectives again, he told them that Burtin and Buci were pulling up as his brother was leaving and that Murry called him when Burtin and Buci got out of the car. When asked if he remembered telling detectives that the hoodie his brother had on was red and black, he said, "I probably did, but I just don't remember." Charles admitted that he told Murry there were cameras at the apartment complex "[s]o [Murry] wouldn't do nothing." When the State asked Charles if he was "concerned at that p[o]int that [Murry] was going to do something to [Burtin]," Charles confirmed that he was.

¶ 33 The State asked Charles if he remembered telling detectives that Murry "said he didn't give a f***" after Charles mentioned the surveillance cameras, to which Charles responded, "I think I did tell them that, yes."

¶ 34    The State also asked Charles if he remembered telling detectives that he guessed that Burtin was "on [his] brother's hit — on [his] brother's list?" Defense counsel objected; the court overruled the objection. Charles confirmed making the statement. The State followed up by asking, "Is it fair to say that even though you knew that [Burtin] was on your brother's list that you didn't know what was going to happen on the night of August 4, 2016?" Charles said he "didn't know anything was going to happen that particular day." He admitted calling Murry after the shooting because his godmother wanted to make sure Murry was okay. Charles stated that he never had any problems with Burtin and that he loved his brother.

¶ 35    The State asked Charles about the final interrogation with Assistant State's Attorney (ASA) Barbara Bailey on August 6, 2016, and if he remembered telling her Murry had gloves. Charles admitted that he did. When the State asked if he recalled telling Bailey that his brother put the gloves on, defense counsel objected. The court overruled the objection. Charles responded, "Yeah, I probably did tell her that."

¶ 36    Charles testified that, during the interrogations, he realized at some point the police suspected him of being "involved" in the shooting. Charles said they wouldn't let him leave and they "wanted information," so he "helped them out." He admitted that, in his first interview with detectives, he did not mention Murry wearing gloves or a hoodie and told them his brother had dreadlocks, a white T-shirt, and ripped blue jeans. He also admitted to telling police that Murry got into a red Impala; he clarified that it was a silver car after police showed him a still photo taken from the video.

¶ 37    Charles also admitted that, on the day of the shooting, he had been smoking marijuana all day, under the influence of ecstasy, and drinking Old English malt liquor. He said that when police arrested him he "just got through getting high."

¶ 38    ASA Bailey testified about interrogating Charles. She showed him photographs to initial and add arrows indicating where he and Murry were standing. ASA Bailey identified three video clips of her interview with Murry, and the State requested they be published to the jury. Defense counsel objected, arguing that the clips were neither impeaching nor material. The court overruled the objection and published the clips. In the first two clips, Charles identified himself and Murry in the photographs taken on the night of the shooting and drew arrows to indicate their positions. In the third clip, Charles tells ASA Bailey that the hoodie his brother was wearing was burgundy-reddish on the hood and the sleeves near the wrists and that the rest was "all black."

¶ 39    The State called several witnesses to describe the investigation, including the recovery of physical evidence, the retrieval of cell phone data, and the medical examination of Burtin. The trial court admitted into evidence photographs of the scene, including recovered shell casings and projectiles.

¶ 40    A medical examiner conducted an autopsy of Burtin, during which the State collected a bloody T-shirt, a blood card, an oral swab, and eight projectiles. Burtin's body had 19 gunshot wounds, with bullets piercing Burtin's scalp, neck, chest, lungs, arms, back, abdomen, buttocks, and legs. The trial court published to the jury autopsy photographs that depicted gunshot entrance and exit wounds, the injury to the heart muscle, the eight bullets recovered from the body, and a sleeveless undershirt.

¶ 41    The State also introduced two stipulations. First, a forensic scientist concluded that 16 fired cartridge cases she examined were fired from the same firearm and that the 9 fired bullets she studied were all from the same firearm, a 9-millimeter handgun. Second, around the time of the shooting, at 12:56 a.m., a phone registered to Murry made an 8-second call to Charles's phone

number, and at 1:21 a.m., a call lasting 58 seconds was made from Charles's phone number to Murry.

¶ 42    Finally, a detective described Murry's booking around two days after the shooting. He noted that Murry "appear[ed] different" than he had at the incident because he no longer had a "braided-type hairdo" and had a fuller beard. The detective testified that Murry's booking photo "truly and accurately depict[ed] the way [Murry] appeared *** when he was placed into police custody." The booking photo showed Murry with multicolored dreadlocks, some of which were cheek-length and others chin-length, as well as a faint mustache and a short beard.

¶ 43    After the State rested, the parties stipulated that Thomas and Abdullah viewed photo lineups containing a photo of Murry and neither identified a shooter. The parties also stipulated that those two had viewed lineups with Murry and did not identify anyone as the shooter.

¶ 44    The jury found Murry guilty of first degree murder and determined that Murry personally discharged the firearm that caused Burtin's death.

¶ 45                                   *Posttrial*

¶ 46    A presentence investigation report reflected that Murry had a positive childhood, without special-education needs or services, drug or alcohol problems, mental health conditions, or gang involvement. Before his incarceration, Murry had been employed and had three previous convictions for armed robbery, for which he received an eight-year concurrent sentence. He has one daughter. His mother is deceased, and he maintains a good relationship with his father and siblings.

¶ 47    The State presented six victim-impact statements from Burtin's girlfriend, niece, two sisters, father, and mother.

¶ 48 Murry's father and aunt spoke on his behalf. The mother of Murry's daughter sent a letter describing his good character and strong relationship with his daughter. Murry declined to give a statement in allocution.

¶ 49 In imposing the sentence, Judge Gregory Vazquez described considering the statutory factors in aggravation and mitigation, emphasizing how Murry's conduct caused Burtin's death:

"I have considered the statutory factors in aggravation and mitigation, whether they're specifically mentioned or not in the history and character of the defendant. *I might note, however, that the defendant's conduct did cause serious bodily harm, in this case death.* That he did have a prior criminal background; albeit, I'm going to consider it as on armed robbery conviction for 8 years. And the sentence in this kind of case is definitely necessary to deter others from committing the crime of this nature." (Emphasis added.)

The court imposed a sentence of 50 years for the murder, along with 30 years for the firearm enhancement, totaling 80 years.

¶ 50 Defense counsel filed a motion to reconsider the sentence, arguing that the sentence was excessive, did not properly account for aggravating and mitigating factors, improperly considered factors in aggravation inherent in the offense, and imposed a trial tax. The court denied the motion.

¶ 51                                      Analysis

¶ 52 Murry argues that the trial court erred by (i) granting the State an extension to the speedy trial term, (ii) failing to properly admonish prospective jurors under Rule 431(b), (iii) permitting the State to use leading questions and a witness's prior statements, (iv) admitting autopsy photos, and (v) imposing an unduly long sentence on several improper bases.

¶ 53                                    *Speedy Trial*

¶ 54    Murry contends that the trial court abused its discretion by granting an extension to the speedy trial term without requiring the State to provide details about why it could not begin the trial within the statutory deadline. We disagree.

¶ 55    The speedy trial statute generally requires "[e]very person in custody in this State for an alleged offense" to "be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody." 725 ILCS 5/103-5(a) (West 2016). A defendant's delays toll this period. *Id.* § 103-5(f). The trial court may extend the period for 60 days if it "determines that the State has exercised without success due diligence to obtain evidence material to the case" and finds "reasonable grounds to believe that such evidence may be obtained at a later day." *Id.* § 103-5(c). We review this decision for an abuse of discretion. *People v. Connors*, 2017 IL App (1st) 162440, ¶ 16.

¶ 56    The speedy trial period began with Murry's arrest on August 6, 2016. Under the statute, the State had until December 4, 2016, to try Murry, which is 120 days after the arrest. Due to the agreed continuances, delays attributable to Murry under the statute, the 120-day period was extended to March 28, 2019.

¶ 57    During this time, the State made numerous efforts to secure Charles's presence for trial. Between November 2018 and February 2019, the State made at least 26 attempts to locate Charles by (i) visiting addresses used by Charles and his family members in Illinois and Wisconsin, (ii) speaking with acquaintances and family members who "refused to provide any information" about Charles's whereabouts, (iii) "call[ing] all possible phone numbers and check[ing] addresses [for] possible family members," (iv) contacting police departments in Wisconsin to request

information about Charles, which revealed an outstanding warrant had been issued in Green Bay, Wisconsin, on September 10, 2018, and (v) checking databases daily for updates.

¶ 58    The State's attempts were ultimately unsuccessful. Not until the day 110 of the speedy trial term, March 18, 2019, did the State learn that Charles was in custody in Oconto, Wisconsin. Days later, the State sought an extension of the speedy trial term.

¶ 59    The State bears the burden of proving that it exercised due diligence to obtain material witnesses. *Id.* "The test of due diligence is whether the State began efforts to locate its witness in sufficient time to secure [his or] her presence before the speedy trial term expired." (Internal quotation marks omitted.) *Id.* To make this determination, we examine the "entire record as it existed at the time the trial court considered the motion for continuance." *People v. Terry*, 312 Ill. App. 3d 984, 990 (2000).

¶ 60    Murry contends the State did "nothing to procure Charles's presence in court" from March 18, 2019, until the end of the 120-day term on March 28, 2019. In his view, "despite locating Charles ten days before the statutory period expired, the State provided no explanation for why it could not procure Charles during the time remaining." Murry faults the trial court for not seeking clarification on March 22 as to why the trial could not begin before the end of the speedy trial term.

¶ 61    Contrary to Murry's suggestion, we find that the State acted diligently after Charles's arrest in Wisconsin. The State (i) served Charles with a subpoena the day following arrest, (ii) obtained a certificate from the trial court three days later, (iii) requested the Wisconsin courts transfer Charles to Illinois for trial, and (iv) coordinated with Oconto County jail officials to transfer Charles to Cook County jail.

¶ 62    Before Charles could transfer, the trial court needed to request the transfer, and a Wisconsin judge was required to hold a hearing to determine that Charles was a material and necessary witness and issue an order directing him to testify at trial. See 725 ILCS 220/3 (West 2018) (describing Illinois process to certify that out-of-state person is a "material witness"); Wis. Stat. Ann. § 976.01(2), (3) (West 2018) (describing Wisconsin process to certify that out-of-state person is a "material witness"). Murry concedes that this "statutory process is required to bring out-of-state detainees to testify in court" but criticizes the State for not providing information about how long this process would take.

¶ 63    We decline to adopt a narrow view of the State's asserted efforts. The State located Charles with only 10 days remaining and initiated a complex transfer process across state lines designed to protect Charles's rights while also upholding Murry's statutory right to a speedy trial. Given the limited time remaining and the statutory steps required for the State, the trial court did not abuse its discretion by granting an extension to the speedy trial term.

¶ 64    Murry's citations of *People v. Battles*, 311 Ill. App. 3d 991 (2000), and *People v. McKinstry*, 2022 IL App (3d) 180598, do not persuade us.

¶ 65    In *McKinstry*, this court reversed the trial court's decision to grant a continuance of the speedy trial term to allow the State additional time to obtain DNA results. *Id.* ¶ 32. But, the State had received the DNA test results on the date the case was set for trial and " 'just want[ed] to explore if there's any other options.' " *Id.* ¶ 25. We concluded that the trial court abused its discretion when it granted the State's motion because the State had already received the DNA test results and "merely did not like [them]." *Id.* ¶ 27.

¶ 66    In *Battles*, we found the trial court abused its discretion by granting the State's request for a continuance to obtain DNA evidence past the expiration of the speedy trial term without making

- 16 -

findings. *Battles*, 311 Ill. App. 3d at 1002. The State claimed that it "promptly gathered samples and delivered them to the crime lab" and that the crime lab was " 'quite backlogged' " to support a finding of due diligence. *Id.* at 1000. Nevertheless, we concluded the State's asserted efforts provided no basis to infer the State had exercised due diligence. *Id.* at 999-1000.

¶ 67    Here, unlike in *McKinstry* and *Battles*, the trial court could reasonably infer the State had exercised due diligence. The State explained that it had been unable to locate Charles until day 110 of the 120-day speedy trial term, and it submitted evidence detailing its repeated efforts to find him throughout that period. Once located, the State moved to subpoena Charles, sought his release from custody in Wisconsin, and arranged for his transfer to Cook County jail so he could testify at trial. Thus, the trial court did not abuse its discretion by granting the State's petition for an extension of the speedy trial term.

¶ 68                                    Rule 431(b)

¶ 69    Murry contends, and the State concedes, that the trial court erred when admonishing prospective jurors under Rule 431(b). But Murry did not object during the trial and now seeks a reversal under the plain error doctrine. Murry has failed to demonstrate that the evidence was closely balanced, and thus, we reject his contention.

¶ 70    Generally, the federal and state constitutions guarantee the rights to a trial by a fair and impartial jury. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Rule 431(b) safeguards these rights. See Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The rule "requires that the trial court ask potential jurors whether they *understand* and *accept* *** enumerated principles, mandating 'a specific question and response process.' " (Emphases in original.) *People v. Wilmington*, 2013 IL 112938, ¶ 32 (quoting *People v. Thompson*, 238 Ill. 2d 598, 607 (2010)).

¶ 71    Here, the parties agree that the trial court erred by asking potential jurors if they "agreed" with the principles in Rule 431(b). See *People v. Belknap*, 2014 IL 117094, ¶ 46 (failure to ask prospective jurors if they both understand and accept principles in Rule 431(b) is error). The trial court should have ensured that the prospective jurors both "understood" and "accepted" the principles. As stated in *People v. Ticey*, 2021 IL App (1st) 181002, ¶ 45, the "Rule 431(b) language is clear and unambiguous—failure to ask whether jurors understand and accept each of the four principles constitutes error." (Internal quotation marks omitted.)

¶ 72    But Murry did not object, so reversal hinges on the plain error doctrine. Reversal can occur only when (i) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (ii) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 73    Murry contends that reversal is necessary under the first prong of plain error review because the evidence was so closely balanced that it threatened to tip the scales of justice against him. When reviewing a claim under the first prong, we apply "a commonsense analysis of all the evidence in context." *Belknap*, 2014 IL 117094, ¶ 50. The burden of persuasion lies with the defendant. *Wilmington*, 2013 IL 112938, ¶ 43.

¶ 74    Murry argues that "the State had little evidence tying [him] to the shooting," as the State presented no gun, no forensic evidence, no inculpatory statements, and no eyewitness identifications. In his view, the sole evidence tying him to the shooting was his brother Charles's testimony, which he challenges as incredible, along with the video surveillance footage, which he deems unreliable.

¶ 75    Murry cites cases that relied on the credibility of a single witness (*People v. Guerrero*, 2021 IL App (2d) 190364, ¶¶ 92-93), cases where there was a credibility contest between witnesses (*Ticey*, 2021 IL App (1st) 181002, ¶¶ 54-55), and cases where eyewitness identifications were the only evidence against a defendant (*Piatkowski*, 225 Ill. 2d at 568-70). Here, no "contest of credibility" occurred, as the defense presented no witnesses to refute Charles's testimony and offered no alibi evidence. This case also did not rely solely on the testimony of one eyewitness or the reliability of eyewitness testimony. Instead, the State built its case on (i) Charles's testimony; (ii) two eyewitnesses who provided several crucial details about the shooter and corroborated Charles's timeline of events; (iii) phone records of contact between Charles and Murry minutes before the shooting and another call less than half an hour after the shooting; and (iv) video footage from multiple surveillance cameras that captured the moments leading up to the shooting, the shooting itself, and the aftermath.

¶ 76    According to Murry, Charles's "purported identification of Murry as the shooter was tenuous and contradicted by his trial testimony." Yet when presented with video surveillance footage from the night of the shooting, Charles identified himself and explained that he "recognize[d] [Murry as the person he was with] because that is the person [he] was talking to at the time."

¶ 77    This video, which was published to the jury, shows Charles talking to Murry around 12:42 a.m. in front of the apartment complex. The footage is in black and white and depicts Murry wearing a distinctive hooded sweatshirt—the front of the sweatshirt is black on one side and white on the other side, with the colors inverted on the hood. The video also depicts Murry putting on black gloves at 12:49 a.m. and getting into the driver's side of a car that pulls up across the street from the apartment building at 12:51 a.m. A van drives past the car Murry entered less than a

minute later. At 12:53 a.m., Burtin and Abdullah get out of the van and walk over to Charles, who is standing in front of the apartment complex. The car Murry got into is parked across the street.

¶ 78    Phone records admitted into evidence reflect that Murry placed an eight-second call to Charles at 12:56 a.m. The video shows the car Murry got into driving away at 12:56 a.m. Video capturing the alley behind the apartment building, which features some color, shows a car resembling Murry's driving into the alley at 12:56 a.m. and a man wearing a black- and maroon-colored hoodie sweatshirt walking toward the apartment building. A camera positioned on the side of the building, which only captures black and white images, shows a man with facial hair and a hoodie sweatshirt that appears black and white walking up the gangway towards the front of the building at 12:58 a.m.

¶ 79    Surveillance video from a camera located in front of the building captures a man wearing the same distinctive hoodie and black gloves running toward the complex at 12:58 a.m. He is seen repeatedly shooting Burtin before running back toward the apartment building. At 12:59 a.m., a man in a hoodie runs back to the car parked in the alley, enters the driver's seat, and drives away. Phone records indicate that Charles placed a call to Murry at 1:20 a.m. that lasted 58 seconds.

¶ 80    In addition to the phone records and video footage, eyewitnesses Thomas and Abdullah corroborated the timeline in the video. Although they failed to identify Murry as the shooter, the physical descriptions they provided match Murry's appearance on the night of the shooting, as well as his booking photo, which was taken two days later. In multiple video clips, Murry wore a hoodie despite Charles's testimony that it was a hot August night.

¶ 81    "[U]ndertak[ing] a commonsense analysis of all the evidence in context" (*Belknap*, 2014 IL 117094, ¶ 50), we do not find that the evidence was "closely balanced." Therefore, the trial court's failure to comply with Rule 431(b) does not warrant a reversal or a remand for a new trial.

¶ 82                    Leading Questions and Prior Statements

¶ 83                              *Leading Questions*

¶ 84     Murry argues the trial court denied him a fair trial by repeatedly allowing the State to introduce key facts through leading questions. We disagree.

¶ 85     At trial, the only question defense counsel objected to as leading was whether it was "fair to say that it was difficult for [Charles] to tell the detectives what it [was] that [he] knew about [his] brother." The trial court sustained defense counsel's objection, which cured any possible error. See *People v. Scott*, 148 Ill. 2d 479, 550 (1992) (finding trial court's immediate ruling on defense counsel's objection to improper question sufficient to cure error).

¶ 86     All other questions Murry challenges on appeal went uncontested at trial. Therefore, we review for plain error and will reverse only if Murry meets his burden on appeal. *People v. White*, 2011 IL 109689, ¶ 133.

¶ 87     Generally, "[a] leading question is one that suggests the answer by putting into the witness' mind the words or thought of the answer." *People v. Lane*, 256 Ill. App. 3d 38, 59 (1993). A trial court must limit leading questions to cross-examination. *People v. Cobb*, 186 Ill. App. 3d 898, 915 (1989).

¶ 88     Murry challenges many of the State's questions as leading, including those related to whether (i) Charles and Murry drove around together on the morning of August 3, (ii) Charles saw Murry with a gun, (iii) Murry came back to Charles's apartment later that night, (iv) Murry had a black and red hoodie, (v) Charles stood outside with Murry at 12:42 a.m. on August 4, (vi) Murry was wearing gloves on the night of the shooting, (vii) Murry called Charles when he was sitting in a car across the street, (viii) Murry called Charles after the shooting, (ix) Charles recognized Murry

- 21 -

on the surveillance video, (x) Charles felt conflicted about speaking to police, and (xi) Murry had a problem with Burtin.

¶ 89    Even assuming these questions were improper, Murry has not established the evidence was "so closely balanced" that the use of leading questions "threatened to tip the scales of justice against" him. See *Piatkowski*, 225 Ill. 2d at 565. After viewing the surveillance video, Charles identified himself and testified that Murry was the person he was talking to outside of his apartment building around 12:42 a.m. the night of the shooting.

¶ 90    In the surveillance video, the man Charles identified as Murry wears a distinctive hooded sweatshirt and gloves. The same video shows Murry getting into the driver's seat of a car parked across the street from Charles's apartment building around 12:53 a.m. and driving away at 12:56 a.m. A second video shows a car that Charles testified looks "like the same car [Murry] was in" coming into the alley behind the apartment building less than a minute later, with a person wearing a hoodie sweatshirt that appears black and maroon getting out of the driver's side and walking toward the apartment building at 12:56 a.m. A third black and white video capturing the gangway on the side of the apartment building shows a man in the same distinctive hooded sweatshirt walking toward Warren Avenue at 12:58 a.m.

¶ 91    Video from the front of the building shows a man wearing a hooded sweatshirt and black gloves running toward the apartment complex with a gun at 12:58 a.m., shooting Burtin multiple times, then running back toward the apartment building just before 12:59 a.m. Video of the alley behind the apartment building shows a man in a sweatshirt running back to the car, getting in the driver's seat, and driving away at 12:59 a.m.

¶ 92    Furthermore, Thomas and Abdullah described the shooter as wearing dark clothing, wearing a hoodie, and having chin-length dreads. Their testimony corroborated the timeline of

events in the video. On a hot August night, Murry was the only person wearing a hoodie, making him stand out. Phone records admitted into evidence also demonstrated a connection between Charles and Murry right before and shortly after the shooting. The records indicated Murry called Charles at 12:56 a.m., lasting 8 seconds, and a second call from Charles to Murry at 1:20 a.m., lasting 58 seconds.

¶ 93 Thus, assuming the State improperly led Charles's testimony in part, a commonsense assessment of all the evidence in this context shows this case was not closely balanced. See *Belknap*, 2014 IL 117094, ¶ 50.

¶ 94          *Prior Statements*

¶ 95 Murry also argues that the State's use of Charles's prior statements to police, which he contends were neither impeaching nor material, requires a new trial. We disagree.

¶ 96 Murry first challenges the State's use of Charles's prior statements to impeach his testimony at trial regarding the color of the hoodie Murry was wearing on the night of the shooting. Charles testified that his brother had a black hoodie. When the State asked him if it was "perhaps black and red," Charles said, "I can't remember if it was red, but I remember it was black." After this testimony, the State called ASA Bailey to testify. She stated that she conducted a videotaped interview with Charles on August 6, 2016, and he described his brother's hoodie as "part of it was black and part of it was burgundy, reddish in color." When the State asked to publish a clip of Charles describing the hoodie, defense counsel objected, arguing that the video was not impeaching or material. The trial court overruled the objection and admitted it.

¶ 97 Generally, a witness's prior statements are inadmissible to prove the truth of the matter asserted. *People v. Myers*, 2023 IL App (1st) 210642, ¶ 50. But a party may use prior statements to impeach a witness's credibility. *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 38. A prior

- 23 -

statement may become substantive evidence if it is inconsistent with the witness's testimony, the witness is subject to cross-examination about it, and the statement was accurately recorded. 725 ILCS 5/115-10.1 (West 2018). Nonetheless, a party may only use prior inconsistent statements of its own witnesses if that witness's testimony affirmatively damages the party's case. *Guerrero*, 2021 IL App (2d) 190364, ¶ 46.

¶ 98    We find that the trial court's decision to admit Charles's prior statements to ASA Bailey was proper because his trial testimony was both inconsistent and affirmatively damaging. For a prior statement to be deemed inconsistent, it does not necessarily have to "directly contradict" a witness's trial testimony. *People v. Zurita*, 295 Ill. App. 3d 1072, 1076 (1998).

¶ 99    Inconsistencies can include "evasive answers, silence, or changes in position." *Id.* at 1077. Where a witness claims to be unable to recall a matter at trial, " 'a former affirmation of it should be admitted as a contradiction.' " *People v. Flores*, 128 Ill. 2d 66, 87 (1989) (quoting 3A John H. Wigmore, Evidence in Trials at Common Law (James H. Chadbourn rev. 1970)).

¶ 100   Charles's testimony that he "c[ould]n't remember" whether the sweatshirt was red but claimed he "remember[ed] [the sweatshirt] was black." This was inconsistent with his prior statement to detectives. Additionally, Charles's trial testimony about the color of Murry's sweatshirt "affirmatively damaged" the State's case, as the man seen on surveillance video getting out of the car in the alley behind the apartment building is wearing a black- and burgundy-colored sweatshirt. Additionally, the man who walked toward the apartment complex from the alley appeared to be wearing a black and white sweatshirt in surveillance video from the side of the building, which captured images in black and white only. Charles's description of the sweatshirt Murry was wearing—black and red, not solid black—was crucial to the State's case because he saw Murry two minutes or less before the shooting occurred. This detail helps prove that Murry

was the individual getting out of the car in the alley at 12:56 a.m., wearing a black and burgundy sweatshirt, and that he was the individual who, a couple of minutes later, shot Burtin.

¶ 101   Murry also objects to the State's questioning of Charles about his interviews with detectives in the days after the shooting. He argues that the State's decision to ask Charles whether he "remember[ed] telling the detectives that [he] guessed that [Burtin] was on…[his] brother's hit list" was improper. But defense counsel objected to this question, and the court overruled the objection, allowing Charles to answer. We find no abuse of discretion; the State asked this question and others to impeach Charles after he stated that he did not remember much of his conversation with detectives on August 5. See *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (stating standard of review).

¶ 102   After Charles stated that he did not remember Murry telling him to "stop hanging out with [Burtin]," the State asked Charles if he remembered speaking with detectives on August 5 and confronted him with several statements he had made relating to Murry's comments and feelings regarding Burtin. This included whether he remembered telling detectives that he "guess[ed] [Burtin] was on [his] brother's list." By professing a lack of memory about much of his previous conversation with detectives, Charles opened the door for the State to impeach him with his prior statements. See *Flores*, 128 Ill. 2d at 87-88 (loss of memory sufficient for substantive admissibility under section 115-10.1).

¶ 103   Murry also objects to the State's questions to Charles about (i) whether Murry called him when Burtin and Abdullah were getting out of the van, (ii) whether he informed Murry there were surveillance cameras at the apartment complex, and (iii) whether Murry expressed indifference after Charles told him about the surveillance cameras. Due to defense counsel not objecting to any of these questions, we review them for plain error. Under this standard, we conclude that reversal

is not warranted regardless of any error because the State's questions about Murry's awareness of the surveillance cameras did not undermine the strength of the evidence against Murry. Overall, the evidence was not "so closely balanced" that any of Charles's objectionable testimony "threatened to tip the scales of justice against" Murry. *Piatkowski*, 225 Ill. 2d at 565.

¶ 104                    *Ineffective Assistance of Counsel*

¶ 105   Murry alternatively argues that trial counsel provided ineffective assistance by failing to object to the State's leading questions and its improper use of Charles's prior statements. To prevail, Murry must demonstrate that (i) counsel's performance fell below an objective standard of reasonableness and (ii) this deficiency prejudiced Murry. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶ 106   We conclude Murry cannot show this because he did not suffer prejudice from the errors he now raises. *People v. Coleman*, 158 Ill. 2d 319, 349-50 (1994) (finding similar argument "without merit" where defendant failed to show prejudice). Based on the strength of the evidence the State presented, we do not find a reasonable possibility that the outcome of the trial would have differed had trial counsel objected to the State's methods of questioning Charles.

¶ 107                         *Autopsy Photos*

¶ 108   Murry claims that the trial court denied him a fair trial by allowing the State to publish "gruesome autopsy photos" when the cause of death was not in dispute. We disagree.

¶ 109   Autopsy photos, while often gruesome, can be admissible if relevant. *People v. Bounds*, 171 Ill. 2d 1, 47 (1995). They can be relevant "to prove the nature and extent of the injuries, the position, condition, and location of the body, *** the manner and cause of death *** and to aid in understanding the testimony of a pathologist or other witness." *People v. Chapman*, 194 Ill. 2d 186, 220 (2000). In general, "the State may offer evidence that tends to prove any fact it needs

- 26 -

to prove, such as the cause or manner of death, even if that fact is not disputed." *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 113. But relevant photos should still be excluded if their "probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 110 The record reveals that, before conducting this balancing, the trial court thoroughly considered the parties' arguments. Defense counsel objected to the State's request to publish certain autopsy photos to the jury during the medical examiner's testimony. While he did not specifically identify which photos were objectionable, he did object to the photos showing a "large, gaping wound in the deceased's chest" that resulted from life-saving measures at the hospital, arguing that these photos were "extremely disturbing."

¶ 111 The State responded that it had "painstakingly" selected 43 photos from hundreds of photos that had been taken during the autopsy, in consultation with the medical examiner, because they "illustrated the 19 gunshot wounds sustained by the victim and showed the location and trajectory of the wounds." The State did not present "bloody photos," as Burtin's body had been cleaned. Further, depicting the large incision in Burtin's chest was "unavoidable" due to its proximity to the gunshot wounds.

¶ 112 The trial court went through the photos individually to confirm that none was duplicative. After the State agreed to remove 1 photo, the trial court admitted 42 photos. We review this decision for an abuse of discretion. *People v. Brown*, 172 Ill. 2d 1, 40-41 (1996). We will reverse if the trial court's decision was "arbitrary, fanciful, or unreasonable such that no reasonable person would agree with the court's conclusion." *People v. Himber*, 2020 IL App (1st) 162182, ¶ 30.

¶ 113 Murry contends that any probative value of all the autopsy photos was "substantially outweighed by the[ ] grisly nature." But the autopsy photographs were relevant and admissible in

showing the 19 separate gunshot wounds Murry sustained, established the cause of death, and aided the medical examiner's testimony. See *Chapman*, 194 Ill. 2d at 220. In addition, the photos were relevant to prove Murry's knowledge or intent. The State needed to prove that Murry intended to cause death or knew that his actions created a strong probability of death or great bodily harm. The autopsy photographs provided evidence of Murry's knowledge and intent by showing the number and location of bullet wounds, as well as the stippling near certain wounds, indicating the shooter's proximity to Burtin. See *Bounds*, 171 Ill. 2d at 47. Moreover, the photograph of the bullet in Burtin's heart relates to Murry's intent to kill.

¶ 114   The autopsy photos were not excessively gruesome or grisly, as Murry contends. The photos depict the 19 separate gunshot wounds to Burtin's body, which appears clean and without blood. Although 13 of the photos show a large incision on the left side of Burtin's chest, this wound appears antiseptic. See *Tatum*, 2019 IL App (1st) 162403, ¶ 122 (finding trial court did not abuse its discretion when it allowed autopsy photos to go to jury during deliberations where "the autopsy photos were not as 'grisly' as defendant would have us believe" though they "depict[ed] a murder victim whose body was riddled with [10] gunshot[ ] wounds" because " 'antiseptic' " photos "show[ed] relatively 'clean wounds' ").

¶ 115   Finally, the trial court carefully examined each photograph before admitting it, ensuring that there were no duplicative images. The court also confirmed that the medical examiner would explain that the surgical incision on the left side of Burtin's chest, visible in 11 of the photos, resulted from a surgical procedure performed before Burtin's death. Although Murry claims that State's exhibit 67, a photo of Burtin's heart with a bullet hole, and exhibit 97, a photo of Burtin's bloody undershirt, were "highly inflammatory and unnecessary to the State's case," he never objected to the admission of these photographs at trial. Consequently, we find no clear or obvious

error in the court's decision to admit them. Accordingly, we conclude that the court did not abuse its discretion when admitting the disputed autopsy photographs.

¶ 116                                      Sentencing

¶ 117   Murry maintains that the sentencing court abused its discretion by imposing an 80-year sentence based on several improper factors. We agree with one of his contentions—that the sentencing court improperly considered a factor inherent to the offense when sentencing Murry.

¶ 118   The trial court has "broad discretionary powers in imposing a sentence." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). But the law delineates the limits of that discretion, and the trial court must be careful not to abuse it. See *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). For example, the trial court cannot punish a defendant for exercising a constitutional right. See *People v. Garcia*, 2023 IL App (1st) 172005, ¶ 73. Nor may it ignore evidence in mitigation. *People v. Maxwell*, 148 Ill. 2d 116, 147 (1992). The trial court must respect the judgment of the legislature and cannot increase a sentence by referencing a factor implicit in the offense. *People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986).

¶ 119   On appeal, we will not substitute our judgment for that of the sentencing court by reweighing the sentencing factors. *Alexander*, 239 Ill. 2d at 213. We presume that the trial court acted within the bounds of the law. *Stacey*, 193 Ill. 2d at 209. Still, we carefully examine the record, focusing on the court's stated reasons for imposing the sentence. *E.g.*, *People v. Johnson*, 2024 IL 130191, ¶ 46 (finding error where "circuit court explicitly referenced [an improper factor] as a factor it considered in imposing the sentence").

¶ 120                                    *No Trial Tax*

¶ 121    Murry argues that the sentencing court imposed a "trial tax" by increasing his sentence because he exercised his right to trial instead of accepting the State's earlier plea offer of six years. We disagree.

¶ 122    Direct proof of a "trial tax" can arise from "overt comments of the trial court to the effect that the sentence imposed was punishment for a defendant's trial demand." *Garcia*, 2023 IL App (1st) 172005, ¶ 73 (citing *People v. Dennis*, 28 Ill. App. 3d 74, 78 (1975)). Indirect proof may include "a great disparity *** between the sentence offered at a pretrial conference to which the trial judge was a participant and one imposed at the conclusion of a jury trial." (Internal quotation marks omitted.) *Id.*

¶ 123    Murry claims that the disparity between the State's plea offer before trial and the 80-year sentence after trial shows the court penalized him. But Murry fails to consider the backdrop of that initial offer. The State offered six years when it was unable to locate Charles, its main witness, and believed it would struggle to prove its case. Moreover, the six-year offer pertained to an aggravated battery with a firearm, not first degree murder with a firearm. *People v. Moore*, 2023 IL App (1st) 211421, ¶¶ 135-37.

¶ 124    Murry also neglects to note that the judge who sentenced him was not involved in the plea negotiations before trial. Judge Pamela Leeming participated in the plea negotiations but retired after Murry's jury trial, prior to his sentencing. See *People v. Walker*, 2021 IL App (4th) 190073, ¶ 68 (limiting indirect proof to circumstances where the trial court was involved in negotiation process).

¶ 125    Besides, the court did not reference any prior plea offer or Murry's right to trial during the sentencing hearing. Although Murry asserts that the court "interjected into the questioning multiple

times to point out that the State's offer was a 'good offer,' and that it might have been 'ridiculous' to reject it," he mischaracterizes the court's comments during the hearing on his motion for a new trial. When viewed in context, the court's questions and comments were efforts to clarify the advice Murry received before ruling on his ineffective assistance claim.

¶ 126   At that hearing, the trial court heard Murry's trial counsel assess whether he provided ineffective assistance during plea negotiations. Trial counsel testified that he was "stun[ned]" when Murry rejected the State's offer of six years on a lesser charge of aggravated battery with a firearm, despite his "advice, multiple times, *** to accept the offer." Trial counsel pointed out that the State had surveillance videos, which showed Murry getting into a car at the scene of the shooting. The court asked trial counsel whether the videos were discussed at the plea negotiations, implying that Murry should consider the strength of the evidence against him when deciding whether to accept the offer. Trial counsel confirmed that the video "was one of the things that I was discussing with him. Along with the fact that [Murry] was counting on his brother, p[er]haps, changing his story." Trial counsel added that he believed Murry was "crazy" not to accept the State's offer, given the strength of the evidence against him.

¶ 127   In sum, the record contains no direct or indirect evidence the court imposed a "trial tax."

¶ 128                                          *Double Enhancement*

¶ 129   Murry next contends the sentencing court improperly relied on a factor inherent in the offense by referencing Burtin's death as evidence in aggravation. We agree.

¶ 130   A sentencing court may not elevate a defendant's sentence based on a factor that forms the very foundation of the offense. *Saldivar*, 113 Ill. 2d at 271-72. True, the court need not "refrain from any mention of the factors which constitute elements of an offense." *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 50. But in a murder case, death cannot serve double duty, as both the crime

- 31 -

and aggravation. *Saldivar*, 113 Ill. 2d at 271-72. We must remand for resentencing when the sentencing court states it considered an improper factor. See, *e.g.*, *People v. Beals*, 162 Ill. 2d 497, 509 (1994) (finding no error where sentencing court did not state it had "considered" the improper factor).

¶ 131   Before sentencing Murry, the sentencing court explained its reasoning. First, it noted that it had read the presentence report and the transcripts of the trial, likening those to "a novel" it "lived with for quite some time." The court then focused on the sentencing hearing held that day, stating: "I have considered some of the evidence of how this offense was committed. And all— and the victim impact statements made by the people who have testified here today. The statements made by counsel in mitigation." Finally, the court detailed how it had weighed all these considerations:

> "I have *considered* the statutory factors in aggravation and mitigation, whether they're specifically mentioned or not in the history and character of the defendant. *I might add, however, that the defendant's conduct did cause serious bodily harm, in this case death.* That he did have a prior criminal background; albeit, I'm going to consider it as one armed robbery conviction for [eight] years. And the sentence in this kind of case is definitely necessary to deter others from committing the crime of this nature." (Emphasis added.)

The court summarized, "I have *considered* [these] factors and the statutory factors in mitigation to the extent that they're present." (Emphasis added.) The sentencing court then imposed a 50-year sentence for first degree murder and a 30-year enhancement for the use of a firearm, totaling 80 years.

¶ 132   While "the defendant's conduct caused or threatened serious harm" is a statutory factor in aggravation (730 ILCS 5/5-5-3.2(a)(1) (West 2018)), bodily harm is also inherent in the elements

of homicide. See *People v. Martin*, 119 Ill. 2d 453, 459-60 (1988). Although a court may properly consider the degree of harm caused by the defendant's actions, it may not impose a higher sentence based "primarily on the end result of the defendant's conduct, [like] the death of the victim." *Saldivar*, 113 Ill. 2d at 271-72. This is what occurred here. See *People v. Joe*, 207 Ill. App. 3d 1079, 1085-87 (1991) (remanding for resentencing where trial court relied on fact that first degree murder defendant's actions caused or threatened serious harm).

¶ 133   We reject the State's contention that the sentencing court "mentioned" the fact that the murder caused serious bodily harm. *Johnson*, 2024 IL 130191, ¶ 46 (finding error where "circuit court explicitly referenced [an improper factor] as a factor it considered in imposing the sentence"). The trial court did what the supreme court has repeatedly cautioned against, by "consider[ing]" the improper factor. See *Beals*, 162 Ill. 2d at 509 (concluding reference to the victim's death was incidental); *Johnson*, 2024 IL 130191, ¶ 46 (finding error where "circuit court explicitly referenced [an improper factor] as a factor it considered in imposing the sentence"). True, when the court discusses the nature and circumstances of the harm caused, those comments do not necessarily require remand. See, *e.g.*, *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 18. But that is not what the court did.

¶ 134   This is not a case where the sentencing court acknowledged a bad fact from the context of the case; the death itself improperly became an aggravating factor for increasing the sentence. The court specifically considered Burtin's death as a statutory aggravating factor, stating: " 'I have *considered* the statutory factors in aggravation ***. I might add, however, that the defendant's conduct did cause serious bodily harm, in this case death.' " (Emphasis in original and omitted.) *Supra* ¶ 131. " 'I have *considered* [these] factors and the statutory factors in mitigation to the extent that they're present.' " (Emphasis in original.) See *supra* ¶ 131.

- 33 -

¶ 135 This is a quintessential example of error—the error *Beals* cautions against. *Beals*, 162 Ill. 2d at 509. The court's language and analysis differs in both tone and substance from the remark that squeaked by in *Beals*. *Id.* (" 'In aggravation the first guideline indicated in the statute is "whether the conduct of the defendant caused or threatened serious harm." Well, we all know that your conduct caused the ultimate harm. It caused the loss of a human life.' "). The court improperly "considered" Burtin's death a second time by emphasizing it when enhancing Murry's sentence. The court's express consideration gave the death an undue legal significance in the sentencing analysis. See *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 14 (error for court to rely on factor inherent to offense when noting general rule against doing so).

¶ 136 Dissent's Improper Reliance on an Inherent Element

¶ 137 Our colleague views the trial court's reference to the victim's death as a simple acknowledgement of the inevitable result of any murder conviction. *Infra* ¶ 148. But that impression overlooks the legal significance of how and when the court made the remark. In stating, " 'I have *considered* the statutory factors in aggravation' " and, " 'I might add, however, that the defendant's conduct did cause serious bodily harm, in this case death,' " the sentencing judge moved beyond context-setting and into impermissible reliance on an element already implicit in the offense. (Emphasis in original and omitted.) *Supra* ¶ 131. Unlike *Beals*, the sentencing court even stated it had "considered" the improper factor, using the exact word the supreme court found missing in *Beals*. See *Johnson*, 2024 IL 130191, ¶ 46 (finding error where "circuit court explicitly referenced [an improper factor] as a factor it considered in imposing the sentence").

¶ 138 Observe also that the sentencing court introduced the comment with "I might add, however," a rhetorical pivot signaling emphasis, not an aside, thereby giving the subsequent list weight as reasons for imposing the sentence.

¶ 139 Peculiarly, despite the sentencing court stressing three factors, the dissent seizes on the second and third, Murry's background and deterring " 'others from committing the crime of this nature,' " and characterizes as a " 'digress[ion]' " the first, causing " 'serious bodily harm, in this case death.' " *Infra* ¶¶ 147, 149, 151, 154. Differentiating these factors in this way ascribes a significance to the judge's words untethered to the sentencing transcript. We must take the record as it is and the sentencing court at its word. *People v. Wardell*, 230 Ill. App. 3d 1093, 1103 (1992) ("If it is on his tongue, it most assuredly must be on his mind.").

¶ 140                                          Remand

¶ 141 Remand ensures that the sentence rests solely on proper legal grounds. See *People v. Dowding*, 388 Ill. App. 3d 936, 945 (2009) (noting reversal proper when, among other things, court makes dismissive or emphatic comments about improper factor).

¶ 142                                  *Excessive Sentence*

¶ 143 Finally, Murry contends the sentencing court abused its discretion by imposing an excessive sentence without adequate consideration of the mitigating evidence. In light of the disposition regarding double enhancement, we do not need to consider this issue. See *People v. Taylor*, 2015 IL 117267, ¶ 33 (reaching sentencing issue before remand would be "premature").

¶ 144 Reversed and remanded.

¶ 145   PRESIDING JUSTICE TAILOR, concurring in part and dissenting in part:

¶ 146   Martin Burtin Jr. died after Tajuan Murry shot him 19 times at close range. Burtin's shooting was caught on video, and it shows others nearby fleeing for their lives. I concur with the majority that the evidence was sufficient to convict Murry of murder. However, the majority errs in remanding for a new sentencing hearing. The sentencing judge, recognizing a fellow citizen's life was taken from him and how it affected his family and the community, stated the obvious, that Murry's killing of Burtin caused serious harm. The trial judge made no further mention of Burtin's murder. Nevertheless, taking that *single* statement out of context and misapplying our supreme court precedents, the majority finds the court aggravated Murry's sentence based on an element of the offense for which he was convicted and remands for a new sentencing hearing. I would affirm Murry's sentence.

¶ 147   The sentencing judge explained its sentence as follows:

"The court has considered the presentence report. And the changes that were made to it. In fact, I have read it several times since we were last in court.

The transcripts of the trial—I was not the trial judge; so I had to read th[e] transcripts twice. First when I thought the case was originally going to go to sentencing and then it didn't. And then the second time in preparation for the last time he actually was in court.

In a way, it's kind of like a novel that I lived with for quite some time.

I have considered some of the evidence of how this offense was committed. And *** the victim impact statements made by the people who have testified here today. The statements made by Counsel in mitigation.

I have considered the statutory factors in aggravation and mitigation, whether they're specifically mentioned or not in the history and character of the defendant. I might note, however, that the defendant's conduct did cause serious bodily harm, in this case death. That he did have a prior criminal background; albeit, I'm going to consider it as one armed robbery conviction for 8 years. And the sentence in this kind of case is definitely necessary to deter others from committing the crime of this nature.

I have considered the factors and the statutory factors in mitigation to the extent that they're present.

And so, I guess in conclusion, having due regard to the seriousness of the offense, and the objective of restoring the defendant's use of full citizenship, I am going to impose a sentence of 50 years on the murder conviction, and 30 years on the use of a firearm during the murder."

¶ 148 The court's statement referencing Burtin's death is identical to the court's statement referencing the victim's death in *People v. Beals*, 162 Ill. 2d 497, 509 (1994), where the defendant similarly argued that the trial court improperly relied on the victim's death as an aggravating factor at sentencing when the victim's death was implicit in the offense of murder. There, the trial court stated, " 'In aggravation the first guideline indicated in the statute is "whether the conduct of the defendant caused or threatened serious harm." Well, we all know that your conduct caused the ultimate harm. It caused the loss of a human life.' " *Id.* Even though the trial court referenced the victim's death, our supreme court held that the trial court did not "consider" the victim's death as an aggravating factor and instead concluded that "the trial court statement was simply a general passing comment based upon the consequences of the defendant's actions." *Id.* Here, the trial court stated the "defendant's conduct did cause serious harm, in this case death," no different than the

trial court's statement in *Beals* that " 'we all know that your conduct caused the ultimate harm. It caused the loss of a human life.' " *Id.* Referring to the trial court's comment in *Beals* as one that "squeaked by," the majority nevertheless contends the trial court's statement here is different "in both tone and substance." *Supra* ¶ 135. Yet it points to nothing in the trial court's comments to distinguish this case from *Beals.* As in *Beals*, the sentencing judge here simply pronounced that a citizen of the community was murdered. And he did it once, not twice as the majority contends. *Supra* ¶ 135. A sentencing judge commits judicial malpractice in failing to acknowledge the victim's death when sentencing a defendant convicted of murder, leading to a loss of public confidence in the judiciary.

¶ 149 A close reading of the trial court's comments reveals that, as it was about to begin its review of the factors in aggravation and mitigation, the court digressed, stating: "*I might note, however, that the defendant's conduct did cause serious harm, in this case death.*" (Emphasis added.) It then proceeded to consider the statutory factors in aggravation and mitigation. In context, it is apparent that the sentencing judge simply made a general reference to the seriousness of Murry's offense, the central tenet of any sentencing hearing. See *People v. Spencer*, 229 Ill. App. 3d 1098, 1102 (1992) ("[T]he seriousness of the offense has been called the most important factor to consider in imposing sentence."). This one reference to the fact that Murry's conduct caused Burtin's death, where the court did not emphasize or prioritize Burtin's death in the slightest but rather explained what occurred, cannot form the basis of a remand for a new sentencing hearing. In remanding for a new sentencing hearing, the majority engages in the type of scrutiny it counseled against in *People v. Hussain*, 2024 IL App (1st) 230471, ¶¶ 32, 34 ("[T]he sentencing court is permitted to thoroughly consider the circumstances of the offense, which is what this court did. The trial court recounted the incident in detail by reviewing the facts of the offense almost frame by frame—

much of it was caught on video and the parties had stipulated to the facts. Often, as here, facts recounted serve double duty, one appropriate and another not." "The flaw in both Hussain's and the dissent's view lies in construing most of what the judge said as potentially significant to the term imposed, an approach that could have the unintended effect of discouraging sentencing judges from providing in-depth explanations for fear appellate courts will misconstrue or overly scrutinize their decisions.").

¶ 150    The *Beals* court further noted that, even if the trial court's comment was "construed in the manner that the defendant suggests," it would still affirm his sentence because the record indicated that the trial court placed little weight on the fact that his conduct caused the victim's death and instead relied on other aggravating factors in sentencing defendant including the victim's age, the fact that the offense was drug related, the need to punish and deter, and the need to protect society. *Beals*, 162 Ill. 2d at 509. Because the court's comments in *Beals* are indistinguishable from the court's comments here, this case is hardly "a quintessential example of error—the error *Beals* cautions against," as the majority concludes. *Supra* ¶ 135.

¶ 151    The majority claims that the circuit court "impose[d] a higher sentence based 'primarily on the end result of the defendant's conduct, [like] the death of the victim.' " *Supra* ¶ 132 (citing *People v. Saldivar*, 113 Ill. 2d 256, 271-72 (1986)). Again, the record does not support this assertion. While the court "note[d]" at sentencing that Murry's conduct "did cause serious bodily harm, in this case death," it based Murry's sentence on a number of mitigating and aggravating factors, including the information contained in the presentence investigation report; Murry's criminal background, including an armed robbery conviction from 2012; and the trial transcripts (because it was not the trial judge), including "some of the evidence of how this offense was committed," which indicates that Murry shot Burtin 19 times, several times at close range and once

- 39 -

in the heart. As *Saldivar* teaches, "in applying the statutory aggravating factor that the defendant's conduct caused serious harm to the victim, [the court may] consider *the force employed and the physical manner* in which the victim's death was brought about." (Emphasis added.) *Saldivar*, 113 Ill. 2d at 271. It's hard to imagine how Burtin's shooting death could have been any more forceful or violent in nature.

¶ 152    Apart from killing Burtin, the record shows Murry caused serious harm in two important respects. First, as the video and trial transcripts reviewed by the court show, in shooting Burtin 19 times, Murry put two other individuals at serious risk of also being shot or killed: Abdullah Lowery, who was standing right next to Burtin, and Brittney Thomas, who was seated in the van immediately next to Lowery and Burtin. Both ran for their lives. Section 5-5-3.2 of the Unified Code of Corrections (Code) provides that a sentencing court may consider certain factors as reasons to impose a more severe sentence, including whether "the defendant's conduct caused or *threatened* serious harm." (Emphasis added.) 730 ILCS 5/5-5-3.2(a)(1) (West 2018); *Saldivar*, 113 Ill. 2d at 269 ("[T]he commission of any offense, regardless of whether the offense itself deals with harm, can have varying degrees of harm or *threatened* harm. The legislature clearly and unequivocally intended that this varying quantum of harm may constitute an aggravating factor." (Emphasis added.)). To illustrate, in *People v. Brown*, 2019 IL App (5th) 160329, ¶ 22, we found no error when the court stated at sentencing after defendant was convicted of murder, " 'The statutory factors in aggravation, I find that the defendant threatened harm and caused harm by his actions,' " where the evidence before the court was that the defendant's actions threatened serious harm to innocent bystanders. The court held, "Section 5-5-3.2(a)(1) does not state that the serious harm to be considered is restricted to the serious harm to the victim, and we decline to judicially recraft the plain language of the section." *Id.*

¶ 153   Second, the court considered the victim impact statements from Burtin's family members, including his mother, who said Murry "destroyed [her] life and the lives of [her] family members" and asked that Murry be "locked away so he could never hurt another family or another person again"; Burtin's girlfriend, who said Murry's "senseless and diabolical act" left her broken and her children without a father; and Burtin's sister, who detailed her "constant fear of [Burtin's] killer getting loose and hurting another family or [her] family" again. The serious harm caused to a victim's family in a murder case may properly be considered a factor in aggravation under section 5-5-3.2, as serious harm to the victim's family is not considered a factor inherent in the offense of murder. See *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 117 ("By contrast, the grief of surviving family members, though a common result of murder, is not implicit in murder itself. The murder victim might have no family, or the family might be indifferent. A deleterious effect on the murder victim's family is a frequent consequence of murder, *not something inherent in murder itself*." (Emphasis added.)); *Brown*, 2019 IL App (5th) 160329, ¶ 22 (no error when the court stated at sentencing, " 'The statutory factors in aggravation, I find that the defendant threatened harm and caused harm by his actions,' " where the evidence before the court was that the defendant's actions caused serious harm to the victim's mother and his four children).

¶ 154   After considering the evidence here, the circuit court found a long prison sentence was "definitely necessary" to deter others from committing similar crimes. The record does not support a finding that the sentence imposed by the court was based *primarily* on the fact that Murry's conduct caused Burtin's death. *Cf. Salvidar*, 113 Ill. 2d at 272 (concluding that the trial court improperly relied on a factor implicit in the offense at sentencing where the court stated "[t]he *number one factor in aggravation*—there are some that come to a lesser degree, but *the one that is probably the most serious* is the terrible harm that was caused to the victim" because the victim's

death was "*the aggravating factor* relied on by the court in fixing the sentence" and "[m]ost of the remainder of the court's comments concerned mitigating factors" (emphases added)).

¶ 155 Time and again, this court has stated that "[t]he trial court is not required to refrain from any mention of the factors which constitute elements of an offense, and a mere reference to the existence of such a factor is not reversible error." *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 50; *People v. Maury*, 2025 IL App (4th) 220887, ¶ 107; *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 15. To obtain a remand for sentencing, a defendant must demonstrate more than a mere mention of an improper fact, he must demonstrate that the trial court actually relied on the improper fact when imposing the sentence. *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007) (citing *People v. Garza*, 125 Ill. App. 3d 182, 186 (1984)); *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 17 (it is reversible error for a sentencing judge "to not merely mention, but rely on, an improper aggravating factor in sentencing").

¶ 156 The circuit court's single reference to the fact that Murry's actions caused Burtin's death does not warrant reversal here. When read in context, the record does not reflect that the court aggravated Murry's sentence based on this factor but instead based its sentence on a number of aggravating factors, including Murry's criminal record, the seriousness of the offense, the victim impact statements, and the need for deterrence. See *People v. O'Toole*, 226 Ill. App. 3d 974, 992 (1992) (a "sentencing court need not unrealistically avoid any mention of such inherent factors, treating them as if they did not exist"); *Sauseda*, 2016 IL App (1st) 140134, ¶¶ 14-16 (finding no abuse of discretion even though the trial court referenced "senseless" shootings and said there was " '[a]bsolutely no reason in the world why [the victim] is dead today' " because, "[w]hen read in context, the trial court's comments here do not show the court improperly imposed sentence based primarily on the fact that [defendant] shot someone with a gun"). "It is the defendant's burden to

- 42 -

affirmatively establish that the sentence was based on improper considerations [citation], and we will not reverse a sentence imposed by a trial court unless it is clearly evident the sentence was improperly imposed [citation]." *Bowen*, 2015 IL App (1st) 132046, ¶ 49. Murry's sentence should be affirmed.

¶ 157   Finally, the majority's decision to remand for a new sentencing hearing, however erroneous, "should not be construed as a mandate to the trial judge to impose a lesser sentence on remand." *People v. Flanery*, 243 Ill. App. 3d 759, 761 (1993). The trial judge "is free to reimpose the same sentence" if he "states that he did not place any weight on the improper factor." *Id.*

¶ 158   I concur in the majority's decision to affirm Murry's conviction but respectfully dissent from its decision to reverse and remand for a new sentencing hearing.

*People v. Murry*, 2025 IL App (1st) 221202

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-13516; the Hon. Pamela Lemming and the Hon. Gregory Paul Vasquez, Judges, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Hanna Lazar Pieterse, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Douglas P. Harvath, Noah Montague, and Margaret A. Hillmann, Assistant State's Attorneys, of counsel), for the People. |