2026 IL App (2d) 240714-U
No. 2-24-0714
Order filed February 4, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-866 |
| JOEY GONZALEZ, | ) ) ) | Honorable Victoria A. Rossetti, |
| Defendant-Appellant. | ) ) | D. Christopher Lombardo, Judges, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not abuse its discretion when it denied defendant's motion to admit certain evidence of the victim's violent character; defendant did not establish ineffective assistance of counsel where counsel failed to challenge the reliability of the methods used by an expert forensic scientist; defendant failed to establish ineffective assistance of counsel where counsel failed to tender a jury instruction that defendant had a right to use force to prevent a forcible felony; and defendant failed to establish his sentence was excessive. Affirmed

¶ 2    Following a jury trial defendant Joey Gonzalez was found guilty of second degree murder,

aggravated battery with a firearm, aggravated discharge of a firearm, and unlawful possession of

a weapon by a felon. The trial court sentenced defendant to 32 years in prison.

¶ 3    On appeal, defendant argues that (1) the trial court erred in barring certain evidence in support of his claim of self-defense of the victim's aggressive and violent character, (2) he received ineffective assistance of counsel where counsel failed to challenge the reliability of the forensic scientist's methods (3), he was denied a fair trial where the jury was not instructed that self-defense includes that deadly force is permissible if a defendant reasonably believes it is necessary to prevent a forcible felony, and (4) the trial court imposed an excessive sentence. For the following reasons, we affirm.

¶ 4                            I. BACKGROUND

¶ 5    This case involves an arranged sale of ten pounds of marijuana gone awry. In 2020 defendant met Jonathon Denicolas (the victim) in the Lake County jail. In 2021, two days after Thanksgiving, defendant and the victim arrived separately at a busy shopping-mall parking lot near a Portillo's restaurant and drive-thru. The failed drug deal ended with gunfire as numerous onlookers feared for their lives and those of their children. The record indicates that only the victim was struck.

¶ 6    A grand jury indicted defendant, along with codefendants Jesse Zumaya and Kevin Wooten, with various offenses relating to the shooting death of the victim in the Portillo's parking lot at Gurnee Mills Mall. Specifically, defendant was charged with second-degree murder (720 ILCS 5/9-1(a)(2) (West 2020)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), three counts of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)).

¶ 7    Prior to trial defendant filed an affirmative defense of self-defense. Pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), and Illinois Rule of Evidence 405(b)(2) (Ill. R. Evid. 405(b)(5) (eff. Jan. 1, 2025), defendant filed a motion *in limine* to admit evidence of the victim's violent conduct:

1) prior convictions of aggravated battery to a police officer, armed robbery, escape, and burglary, 2) five messages recovered from the victim's cellphone, and 3) four photos recovered from the victim's phone depicting him with various firearms. The trial court, Judge Victoria A. Rossetti, presiding, granted defendant's motion in part and denied it in part, ruling that only the victim's prior convictions for armed robbery and aggravated battery were admissible.

¶ 8      The evidence at trial, Judge D. Christopher Lombardo, presiding, revealed that between November 19, and the day of the shooting on November 27, 2021, the victim and defendant exchanged numerous Facebook and text messages. The messages indicated that the victim and defendant planned to meet for defendant to sell ten pounds of marijuana to the victim. Defendant and the victim agreed to meet on November 27, 2021, in the Portillo's parking lot at approximately 2 p.m. Three days before the meeting the victim sent Edwin Victoria a screenshot of his conversation with defendant where they discussed the marijuana sale. The victim commented to Victoria about the screenshot, "Brooo wtf im tryna hit this lick on his ass fo." The parties stipulated that "this lick" is slang for a robbery.

¶ 9      On November 27, 2021, at 2:10 p.m., Gurnee Police Sergeant Jonathan Savage testified that he responded to a call of shots being fired at the Gurnee Mill's Mall Portillo's. When he arrived at the scene the victim was laying in the parking lot. Savage found no weapons on or near the victim. A "good Samaritan," David Sutton, tended to the victim.

¶ 10      Sutton testified that on the day of the shooting after he, his wife, and child ate at Portillo's, they walked to their car. Sutton heard gunshots that he initially thought were fireworks, but after he heard a second set of gunshots he pushed his wife and child to the ground. Sutton heard a total of 14-16 gunshots. Between the two sets of gunshots Sutton looked up and saw "an individual standing there with his arm raised and several other individuals running away from him in the

parking lot." The man with his arm raised was "[s]hort to medium stature, bald head[ed], Hispanic, [and was] wearing baggy clothes." He was in the northwest corner of the parking lot near the radio station's white trailers and buses. When asked whether he saw anything in the man's hand, Sutton replied, "All I could really see was his hand was raised and people were running away from him." Sutton demonstrated that the man's right arm was extended straight out from his body and parallel to the ground. Then the victim ran towards Sutton's car. Sutton tackled the victim to the ground. The victim did not resist. The victim was unarmed and had bullet wounds in his upper right shoulder, lower right rib cage, and lower abdomen. Sutton applied pressure to the victim's wounds until emergency medical technicians arrived.

¶ 11 Mario Garcia, who was also at the scene of the shooting, testified that he and his wife picked up food from Portillo's and ate while parked near the radio station vehicles. Mario heard gunshots, looked over his shoulder and saw a man shooting a handgun standing next to the passenger side of a white pickup truck. The shooter faced the Portillo's parking lot and aimed at a man who ran past Mario's car. The shooter was roughly 5'4" tall, "somewhat built," had light skin, and was "a little bulky."

¶ 12 Roberto Garcia testified that at the time of the shooting he was at Portillo's with his wife and three children. While in the drive thru, Garcia heard what he first thought were fireworks, and he heard more of the same popping sounds along with what sounded like screaming. After the second round of popping sounds, he saw someone running toward Portillo's. The man was tall, skinny, with long hair. Garcia drove his vehicle "to get some coverage from the building." Then he saw an Audi drive in front of his vehicle. After the Audi exited the parking lot, a white pickup truck dashed "out and almost hit a couple of vehicles because of the way it was driving."

¶ 13 Nathainel Cessna testified that he and his girlfriend were parked next to a white pickup

truck in the Portillo's parking lot at the time of the shooting. Cessna was about to exit when he saw a "gray crossover" quickly back out of a parking spot. The gray crossover was parked next to the white pickup truck. "[T]hen once the [gray crossover] started to speed away, [Cessna] noticed that a door had kind of fallen open, somebody had fallen out of the [gray crossover]," and the man rolled a bit. Then a different man got out of the driver's side of the white pickup truck and stepped onto the ledge to look over the bed of the truck. This man had a wide build, dark hair, and dark skin. Cessna heard a gunshot. He and his girlfriend put their heads down and then heard five or six more gunshots. "It sounded like a clip [sic] got emptied." The shots sounded like they came from the white pickup truck. The shots were fired after the gray vehicle started to drive away and "slightly after" the man fell out of the vehicle. After the shooting stopped Cessna looked up and saw the man who fell out of the gray vehicle crouch or hide between parked cars. Then, the white pickup truck backed out of the parking spot and drove to the same exit as the gray vehicle. Cessna exited the parking lot and called the police.

¶ 14     The parties stipulated that if Edward Sohr were called as a witness, he would testify that on the day of the shooting at approximately 2:12 p.m. he assisted a stranger lying in the Portillo's parking lot who apparently had been shot. Sohr asked the victim "do you know who shot you"? The victim replied, "no."

¶ 15     Evidence technicians recovered 18 fired 9mm shell casings near the white bus belonging to the radio station and one fired .380-caliber shell casing in the parking aisle of the parking lot near the white bus.

¶ 16     Surveillance video from Portillo's security cameras shows an Audi with shot-out windows leaving the area and a white pickup truck exiting shortly thereafter. Surveillance video from several stores at the Gurnee Mills mall show a white pickup truck, a gray Audi, and a white Dodge

Challenger with red racing stripes. Video depicts a man running in the parking lot at 2:09 p.m., the same time the Gurnee Police Department received a call of shots fired.

¶ 17 After the shooting, Zion Police Sergeant Nicholas Richards went to a home on Spruce Court in Vernon Hills where he found a white Dodge Challenger parked. Richards had the vehicle towed to the Gurnee Police Department. Richards contacted the registered owner, Angelica Aleman and her boyfriend, Wooten. A portion of one of the stripes on the Challenger was covered by duct tape, and underneath there appeared to be recent damage from a projectile. Wooten gave Richards a black bag containing a .380 caliber handgun, several magazines, and additional ammunition.

¶ 18 Braulio Jesus Ornelas de la Cruz testified that he worked with Zumaya. On Thanksgiving 2021, two days before the shooting, Cruz lent Zumaya his white Chevy Silverado pickup truck. A few days later, Cruz discovered the keys to his white pickup truck in his driveway. He eventually found his pickup truck in a Round Lake storage lot. Cruz allowed the police to tow his pickup truck to be photographed and processed.

¶ 19 The storage lot surveillance cameras show that the white pickup truck arrived at the lot at 3:41 p.m. on the day of the shooting. One minute later, two men walked out of the lot and down the road.

¶ 20 Yenitza Marquina, who lived in Waukegan, testified that on the day of the shooting, the victim borrowed a 2019 gray Audi Q5 that belonged to her boyfriend's mother. Marquina and her boyfriend used the Audi and paid the note. At approximately 1:00 p.m. the victim drove off in the Audi alone. Later that afternoon or early evening the Audi was parked in Marquina's driveway and the keys were in the cupholder. The Audi had multiple bullet holes. Two days after the shooting police officers came to Marquina's home looking for the Audi. The officers had the Audi

towed from Marquina's grandmother's garage where Marquina had moved it.

¶ 21    Stephen Kueber, an evidence technician, photographed the Audi. The photographs showed several bullet holes including, in the rear passenger-side door, directly above the rear license plate, in the windshield, and the rear window. Kueber testified that a bullet hole "could have" entered through the back window and exited through the windshield.

¶ 22    Gurnee Police Sergeant Matt Bendler, the lead detective on the case, testified that Zumaya was 5'10", 170-175 pounds, and defendant was 5'9", 250-260 pounds. Bendler testified that someone other than the victim drove the Audi from the crime scene and the driver had been identified but no arrest warrant had been issued for the driver.

¶ 23    Gary Lind, a forensic scientist at the Northeastern Illinois Regional Crime Lab, testified that he was certified in firearm evidence examination and identification with specialized training from various firearm manufacturers and the Association of Firearm and Toolmark Examiners. Lind used a comparison microscope to compare class and individual characteristics. This allowed him to determine "whether or not a fired bullet, discharged shot shell, or discharged cartridge case was fired in one particular firearm." When the State sought to admit Lind as an expert in the field of firearm and tool mark identification, defense counsel did not object. The trial court stated, "by agreement, this witness will be so designated in that field as an expert."

¶ 24    Lind testified that he received 18 nine-millimeter discharged cartridge casings, one .380 auto caliber discharged casing, and five fired bullets. Lind opined that the .380 auto caliber discharged cartridge was fired from Wooten's gun, 13 nine-millimeter casings were discharged from an unknown weapon, and the other five nine-millimeter casings were discharged from a different unknown weapon. Three of the five fired bullets were recovered from the inside the Audi. The other two fired bullets were recovered in the parking lot near a dumpster and inside a parked

Hyundai. Lind could not determine whether the five fired bullets were fired from the same or different firearms.

¶ 25     An autopsy revealed that the victim died from two gunshot wounds. An expert in forensic pathology, Dr. Eimad Zakariya, testified that the victim was shot twice "through and through" from more than two feet. Zakariya believed that the victim's chest wound was an exit wound. The victim had a blood alcohol content of .064. An abrasion on the victim's leg was consistent with falling out of a moving vehicle.

¶ 26     Luis Flores testified that a few hours after the shooting defendant called him and asked for a ride from Zumaya's house. During the drive defendant told Flores that he was at Gurnee Mills that afternoon for a "weed exchange" and that he was going to get robbed. Defendant also told Flores that shots were fired but he did not say who fired them. When Flores was interviewed by police three days after the shooting, he told them that defendant said, "a dude in the Audi tried to rob [him]."

¶ 27     The parties stipulated that defendant had a prior qualifying felony conviction for purposes of the charge of unlawful possession of a weapon by a felon. The parties also stipulated that the victim had been convicted of armed robbery and aggravated battery to a police officer. The State rested and the trial court denied defendant's motion for a directed verdict.

¶ 28     Defendant testified that the victim was a friend he met in 2020 while in the Lake County jail. At that time defendant learned about the victim's prior convictions. Defendant often helped the victim with things including giving him his Link card, money, and supplies for the victim's son. One of the text messages defendant sent to the victim stated, "u know u r a brother to me if I got it u got it."

¶ 29     Defendant further testified that about one week before the shooting, he and the victim tried

to set up a meeting for the sale of ten pounds of marijuana, but the meeting was delayed because defendant was concerned about the police. Defendant knew the victim had no money and therefore was not supposed to be the ultimate buyer of the marijuana. Instead, the victim was to facilitate the purchase for his relative. Eventually, defendant set the meeting at the Gurnee Mills mall parking lot in the afternoon on November 27, 2020. Defendant chose that location because he thought it would be safer, there were "a bunch of people there," there were cameras, and it was less likely that something would happen.

¶ 30    Defendant lived in Vernon Hills with his roommate, Angelica, who owned a white Dodge Challenger with red racing stripes. On the morning of the shooting, defendant left his car at home and took an Uber to codefendant Zumaya's home. Defendant did not bring the marijuana with him. He texted Angelica to ask her to take the ten pounds of marijuana from his room and meet him with it.

¶ 31    Defendant also testified that Zumaya drove him in a white Chevy Silverado pickup truck that belonged to Zumaya's boss. Defendant and Zumaya met Angelica at a storage unit. Angelica's boyfriend, codefendant Wooten, accompanied her, though defendant asked that he not come. Defendant took one pound of marijuana from Angelica and left the remaining nine pounds in Angelica's Dodge Challenger. Defendant did this because he would not be able to hide all ten pounds very well in the white pickup truck. The plan was that Wooten would hold onto the remaining nine pounds until defendant texted him, at which point Wooten would leave the box of marijuana in front and defendant would hand it over to the buyer.

¶ 32    Defendant testified he was not aware that there was a firearm in the Dodge Challenger or that Zumaya had brought a firearm. Defendant did not bring a firearm to Gurnee Mills on the day of the shooting. Defendant, Zumaya, Wooten, and Angelica arrived at Gurnee Mills at

approximately an hour and a half before the scheduled time. The Audi arrived 30 minutes later, or an hour before the scheduled time. The Audi backed into a parking spot on the passenger side of the white pickup truck such that the two passenger sides faced each other. Defendant approached the Audi and told the driver to come to the white pickup truck because he did not want to get into the Audi. The victim rolled down his window and told defendant to get into the Audi. Defendant went back to the white pickup truck and grabbed one pound of marijuana and then got into the rear passenger side of the Audi. The victim patted defendant down and confirmed that defendant did not have a gun.

¶ 33    Defendant testified that he sat down next to the victim who sat in the rear driver-side seat. Two men, unknown to defendant, sat in the front seats. Defendant described the driver as Hispanic, dark-skinned, around 300 pounds, with a beard, buzz haircut, and tattoos, and approximately 30 years old. The man in the front passenger seat was Hispanic, bald, young, and wore a COVID mask.

¶ 34    Defendant handed the driver the pound of marijuana and the driver looked at it while defendant and the victim made small talk about their kids. The driver then asked where the rest of the marijuana was, and defendant replied that "as soon as [he] saw the money *** it would be right here." Defendant became distracted at that point because Zumaya started playing music from the white pickup truck Then in the Audi, defendant heard a "click." When defendant turned to look he saw "three guns pointed at [him]." The victim had a revolver and the two men in the front seats had black guns with extended magazines.

¶ 35    Defendant testified he put his hands up and said, "they could have it all." Defendant tried to open the car door twice but was unsuccessful. Defendant believed the child safety-lock was on. Defendant quickly reached his arm out the window and opened the car door from the outside. As

defendant exited the Audi, a bullet flew past his ear. Defendant testified that the bullet retrieved from the Audi's passenger-side trunk was behind where he sat.

¶ 36    Defendant fell to the ground and crawled under the white pickup truck. When he reached the driver's side of the truck the driver's door opened. Zumaya screamed and asked what was happening. Zumaya had a gun in his hand. Defendant took the gun from Zumaya because "[t]he shots never stopped," and he was in fear for his life. While defendant stood in the back of the white pickup truck he shot at the Audi between four and six times.

¶ 37    Defendant testified that he ducked behind the white pickup truck, and when he peaked up, he saw the victim run to the Audi, put one foot in the door, and throw his gun in the Audi. Defendant ducked backed down and when he peaked up again, the victim was on the parking lot ground and the Audi swerved. Defendant fired two more shots into the back of the Audi and then shot four to eight times in the air to scare the shooters away. When defendant fired at the Audi he believed his life was in danger and that if did not fire at the Audi he would have died. Defendant denied that he aimed at the victim or shot him in the back. He did not see Zumaya fire a gun.

¶ 38    The State began its closing by arguing:

"It was the defendant who *robbed* [the victim's family] that day when he took [The victim's] life. *** [Defendant] *robbed* them of future experiences, future time, and future experiences.

Not only that. This defendant also *robbed* David Sutton and his daughter, Roberto Garcia and his family, Mario Gonzalez and his wife, Hali -- Hali Wilson, Danielle Standford, and everyone else that was at Gurnee Mills or Portillo's that deadly Saturday. He *robbed* them of their sense of security, their sense of safety in their own community. This defendant was selling ten pounds of cannabis to [the victim] that day, and you heard

about something that didn't go as planned despite his meticulous planning." (Emphases added.)

¶ 39   In response, defense counsel argued:

"[T]he one thing that [the State] completely ignored is what is at the heart of this case, and that is the fact that [defendant] was being robbed by a convicted armed robber who expressed his intent to rob [defendant] three days prior. That is Defense Exhibit 1 admitted into evidence, the texts. I'm going to hit that lick on his ass. He's telling that to Edwin Victoria, all the while he's making these plans to set up this marijuana deal with the guy [defendant] regards as a brother who would do -- give the shirt off his back for.

\*\*\*

[Defendant] testified. It's unrebutted He helped this guy out. He gave him food. He gave him shelter. What's mine is yours. And what was his repayment? Getting hit as a lick. Getting robbed.

\*\*\*

The victim assumed the risk that he could lose his life in an attempted robbery.

\*\*\*

[I]f [the victim] wasn't unfortunate enough to be shot, he would be the one on trial for armed robbery.

\*\*\*

Maybe [the men in the Audi] weren't murderers, but we know they were armed robbers. How do we know that? We know that because [the victim] told us that. He never expected that text that he sent to Edwin Victoria to come out in the open when he's saying I'm going to hit that lick on his ass, but it was subpoenaed. It was -- it was obtained by the government. We know it, so that was his intent.

***

> We know [defendant] was being robbed. How is that controversial? How -- how can you not conclude that?"

¶ 40    The jury found defendant guilty of all counts. The trial court denied defendant's motion for a new trial. Defendant filed a timely notice of appeal.

¶ 41                                    II. ANALYSIS

¶ 42    Defendant argues that the trial court erred when it barred certain evidence of the victim's aggressive and violent character including text message photos of the victim aiming a firearm at the camera with his finger on the trigger, and text and Facebook messages in which the victim stated his intent to commit robberies and bragged about shooting at a house. Defendant maintains that this material was admissible pursuant to *Lynch*, 104 Ill. 2d 194, and Illinois Rule of Evidence 405(b)(2) (eff. Jan. 1, 2011).

¶ 43    In *Lynch*, 104 Ill. 2d 194, 200, our supreme court held that when a defendant alleges self-defense, a victim's aggressive and violent character may be relevant to show who was the initial aggressor. This evidence may be relevant for one of two reasons: (1) to show that the defendant's knowledge of the victim's violent tendencies affected his perceptions of and reactions to the victim's behavior, and 2) to support the defendant's version of the facts where there are conflicting accounts of what happened. *Id.*; see also Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011).

¶ 44    Under the first basis of *Lynch*, the evidence is relevant only if the defendant knew of the victim's violent acts. *Lynch*, 104 Ill. 2d at 200; *People v. Figueroa*, 381 Ill. App. 3d 828, 841 (2008). Here, defendant does not claim that, prior to the shooting, he was aware of the photos or text and Facebook messages at issue. Therefore, the first basis of *Lynch* does not apply here.

¶ 45    Here, defendant maintains the evidence was admissible under the second basis of *Lynch*.

The second basis for admissibility under *Lynch* is codified in Rule 405(b)(2) of the Illinois Rules of Evidence. See Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011); *People v. Chavez*, 2025 IL App (1st) 221601, ¶ 162. That rule reads:

> "In criminal homicide or battery cases when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of *specific instances of the alleged victim's prior violent conduct.*" (Emphasis added.) Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011).

¶ 46    Defendant was required to comply with the requirements of Rule 405(b)(2) when he sought to offer the photos and messages as "propensity" evidence. *Chavez*, 2025 Ill App (1st) 221601 ¶ 163. The rule allows a defendant to offer proof of "specific instances of the alleged victim's prior violent conduct." *Id.*

¶ 47    A trial court's decision on the admissibility of evidence, including in the context of *Lynch* "will not be reversed absent a clear abuse of discretion." *People v. Morgan*, 197 Ill. 2d 404, 455 (2001).

¶ 48    Here, the victim sent text messages wherein he stated, "Folks, we hitting licks today ifgaf," "I'm flamed Chin tf up," "Chin's house had like 200 holes," and "We takin dem pounds today omm." These messages do not qualify as proof of "specific instances of the alleged victim's prior violent conduct," (*Chavez*, 2025 Ill App (1st) 221601 ¶ 163). They are not proof of any violent acts that the victim performed in real life — for example, witness testimony, videos or photos of the victim shooting or robbing anyone. While the victim sent messages about such things, these messages were not proof of actual violent conduct.

¶ 49    Similarly, the victim's photos embedded in his text messages that depict him aiming a firearm at the camera with his finger on the trigger, do not qualify as proof of specific instances of

violent conduct. We agree with the trial court that this evidence was not probative of violent or aggressive behavior. Possession of a weapon, without additional evidence that it was used in a violent manner, is not probative of a violent character, nor does it show a propensity for violence. *People v. Cruzado,* 299 Ill. App. 3d 131, 137 (1998); *People v. Costillo,* 240 Ill. App. 3d 72, 82 (1992). Simply put, this evidence does not make it more likely that the victim, rather than defendant, was the initial aggressor on November 27, 2021, when the shooting occurred. Accordingly, the trial court did not abuse its discretion when it excluded the messages and photos at issue.

¶ 50    Further, even where evidence of the victim's propensity for violence should have been admitted, reversible error does not always occur if a trial court improperly excludes it. *People v. Armstrong*, 273 Ill. App. 3d 531, 536 (1995). Such error is not reversible when it amounts to harmless error (*People v. Figueroa*, 381 Ill. App. 3d 828, 846 (2008)), and such error is harmless when the *Lynch* evidence is cumulative to other evidence presented at trial (see *People v. Martinez*, 2021 IL App (1st) 182553, ¶ 48).

¶ 51    Here, the jury heard ample evidence of the victim's violent and aggressive character, specifically that he was convicted of aggravated battery of a police officer in 2020 and armed robbery in 2014. The jury also heard evidence that three days before the shooting the victim sent a person named Edwin Victoria a screenshot of his conversation with defendant discussing the upcoming marijuana sale. The victim messaged Victoria, "Brooo wtf im tryna hit this lick on his ass fo." The parties stipulated that "lick" is slang for robbery. Thus, we determine that any error in the exclusion of the victim's messages and photos was harmless because evidence was presented from which the jury could have concluded that the victim's character was violent and aggressive. See *Martinez*, 2021 IL App (1st) 182553, ¶ 49.

¶ 52    Next, defendant maintains that he received ineffective assistance of counsel where counsel failed to challenge the testimony of forensic scientist Lind and failed to cross-examine him regarding the reliability of the firearms identification and comparison methods he used. Because we determine that defendant cannot establish prejudice, we need not address whether counsel's performance was deficient.

¶ 53    We review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, which this court adopted in *People v. Albanese*, 104 Ill. 2d 504 (1984). To succeed on a claim of ineffective assistance of counsel, defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. "A defendant must satisfy both prongs of the *Strickland* test[,] and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Keys*, 2025 IL 130110, ¶ 57.

¶ 54    A lack of prejudice renders irrelevant the issue of counsel's alleged deficient performance. *Id.* ¶ 58. Therefore, we may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong. *Id.* Prejudice occurs when there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*

¶ 55    Here, defendant asserts that he was prejudiced by Lind's testimony that the 19 shell casings found in the Portillo's parking lot were discharged by only three weapons. One .380 caliber casing was fired from a firearm provided by codefendant Wooten, 13 nine-millimeter casings were fired from an unknown firearm, and five nine-millimeter casings were fired from another unknown firearm. Lind did not opine that defendant fired a gun; rather, defendant testified that he fired a gun. Defendant testified that he fired between 10-16 times from where bullet casings were recovered. Defendant stated that he fired at the Audi because he was in fear for his life. All 18 of

the nine-millimeter casings were located where defendant confirmed he was located; in the spot where he had parked the white pickup truck. He testified that he and Zumaya were on the opposite side of the Audi and that Zumaya did not fire a weapon. Therefore, defendant has failed to show a reasonable probability that, absent counsel's alleged error, the outcome of his trial would have been different, and his claim of ineffective assistance of counsel must fail. See *Strickland,* 466 U.S. at 687.

¶ 56    Defendant also contends that he was denied a fair trial where the jury was provided an incomplete self-defense instruction; the instruction did not include that the use of deadly force is permissible if the defendant reasonably believes the force is necessary to prevent the commission of a forcible felony. Defendant concedes that defense counsel did not object to the instruction and the record reveals that counsel agreed to the instruction. Defendant, however, maintains that we can still review the error through the plain-error doctrine. We disagree.

¶ 57    "[I]nvited error or acquiescence does not raise a mere forfeiture to which the plain-error exception might apply; it creates an estoppel that precludes plain-error analysis." (Internal quotation marks omitted.) *People v. Quezada*, 2024 IL 128805, ¶ 59. Further, invited error "'goes beyond mere waiver' such that the traditional exceptions to the waiver rule do not apply." *In re Detention of Swope*, 213 Ill. 2d 210, 218 (2004) (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)). Because defense counsel agreed to the instruction as given, defendant is estopped from raising any claim that the trial court erred in instructing the jury regarding self-defense in the manner that counsel acquiesced.

¶ 58    Defendant also argues that he was deprived of his right to the effective assistance of counsel when defense counsel failed to object to the incomplete self-defense instruction and failed to tender a complete self-defense instruction that included that the use of deadly force is permissible if the

defendant reasonably believes the force is necessary to prevent the commission of a forcible felony.

¶ 59    "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004). "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). A defendant is entitled to have the jury instructed on any legally recognized defense theory as long as there is some evidence which, if believed by the jury, would support that defense. *People v. McDonald*, 2016 IL 118882, ¶ 25. "Defense theories typically provide affirmative defenses to or mitigation of the charged offenses." *People v. Davis*, 213 Ill. 2d 459, 478 (2004).

¶ 60    Illinois Pattern Jury Instruction, Criminal, No. 24–25.06 (4th ed. 2000) (IPI Criminal 4th No. 24-25.06) provides:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend [(himself) (another)] against the imminent use of unlawful force.
>
> [However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent [ (imminent death or great bodily harm to [ (himself) (another)] (the commission of _____).]"

The committee note for IPI 24-25.06 states that the blank space should be filled in with the forcible felony involved, "[w]hen applicable." See IPI Criminal 4th No. 24-25.06, Committee Note. Here,

the trial court gave the entire instruction except for identifying a forcible felony.

¶ 61    IPI Criminal 4th No. 24-25.06 is based on section 7-1 of the Criminal Code of 2012 (the Code) (720 ILCS 5/7-1 (West 2022)), which provides that a person is justified in using deadly force "only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." *Id.* Section 7-1 also provides that a person is justified in the use of deadly force only if he reasonably believes such force is necessary to prevent the commission of a forcible felony. *Id.* The definition of "forcible felony" includes robbery. *Id.* § 2-8. "A person commits robbery when he or she knowingly takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force." *Id.* § 18-1. A person commits armed robbery when he commits a robbery while armed with a firearm. *Id.* § 18-2.

¶ 62    The familiar standard set forth in *Strickland* applies to claims of ineffective assistance of counsel. A defendant must show that his counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that the result of the proceeding would have been different but for counsel's unprofessional errors. *Strickland*, 466 U.S.at 694. Matters of trial strategy are generally immune from ineffective assistance of counsel claims. *People v. Jones*, 2023 IL 127810, ¶ 51.

¶ 63    Here, defendant was not prejudiced by the failure to give the jury the forcible-felony component of IPI Criminal 4th No. 24-25.06. Courts have repeatedly rejected similar arguments that the failure to give the forcible-felony portion of the instruction was prejudicial where the jury received the general self-defense portion and the force used was necessarily the same.

¶ 64    In *People v. Jackson*, 304 Ill. App. 3d 883 (1999), the defendant was charged with, *inter alia*, first-degree murder. Despite being instructed on self-defense, the jury found the

- 19 -

defendant guilty. On appeal, the defendant, citing evidence that the victim attempted to kiss him, argued that the jury should have been instructed on the use of force to prevent the forcible felony of sexual assault. The court found no evidence to support this theory but, even if it had, would have found the error harmless. Noting that the jury had been instructed on self-defense, the court held that the defendant "received the jury's informed consideration of his theory of defense." *Id.* at 892. The court cited *People v. Flores*, 282 Ill. App. 3d 861 (1996), and *People v. Wilburn*, 263 Ill. App. 3d 170 (1994). In both cases, the defendants were convicted of murder. They asked for instructions on the use of deadly force to prevent an aggravated battery. The appellate courts reasoned that in deciding whether the defendants used deadly force to prevent imminent death or great bodily harm, the juries necessarily considered whether the defendants used deadly force to prevent aggravated batteries upon themselves. *Jackson*, 304 Ill. App. 3d at 892 (citing *Flores*, 282 Ill. App. 3d at 866 and *Wilburn*, 263 Ill. App. 3d at 178).

¶ 65 Here, where the jury rejected defendant's contention that he was justified in shooting because he feared for his life, it necessarily rejected any notion that defendant was justified in shooting to prevent an attempted robbery of nine pounds of marijuana. According to defendant, the nine pounds of marijuana were in the Dodge Challenger, and not in the white pick-up truck where defendant fired his weapon. Thus, the failure to give the forcible-felony component of IPI Criminal 4th No. 24-25.06 was, at most, harmless.

¶ 66 *People v. Milton*, 72 Ill. App. 3d 1042 (1979), which defendant cites, is distinguishable from this case. There, witnesses testified that the defendant and one of the victims had been gambling. The defendant apparently had won some money, and witnesses testified that the victim repeatedly demanded money from the defendant before eventually reaching for a gun. Thus, there was evidence from which the jury could have concluded that the victim was attempting to rob the

defendant but not to kill or injure him. *Id.* at 1049. Accordingly, the reviewing court held that it was error for the trial court to instruct the jury on the use of force to avoid death or great bodily harm but not on the use of force to prevent the forcible felony of robbery. *Id.*

¶ 67 Here, by contrast, defendant testified that, while in the Audi with the victim, he gave the driver one pound of marijuana and the driver asked where the rest of it was. After defendant responded that he would get it when he saw the money, the three men in the Audi pointed guns at defendant. Defendant escaped from the Audi and ran to the white pickup truck where he grabbed a firearm and began shooting at the Audi. Defendant testified that he fired because he was afraid for his life. Defendant's own account did not raise the possibility that potentially deadly force was needed to prevent an alleged robbery.

¶ 68 The record does not contain even slight evidence that defendant's actions were necessary to prevent a forcible felony. Defendant's testimony establishes that he shot his firearm after the victim and his cohorts attempted to rob defendant in the Audi. Because the attempted armed robbery was complete, no evidence supported the giving of the forcible felony part of the self-defense instruction. Therefore, defendant cannot show prejudice.

¶ 69 We note that defendant's reply brief contains factual assertions with no citations to the record. Defendant maintains in his reply brief that he testified that the victim "and the other men in the Audi fired shots at [him] *** to prevent him from leaving with the remaining marijuana." Also, he asserts that he testified that "he only fired his weapon in response to the robbers' attempt to prevent his escape." After reviewing defendant's testimony, we are troubled by defendant's plainly erroneous factual assertions. We strike these unsupported assertions because they violate Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) by not citing a page in the record for his contention, and Rule 341(j) (eff. Oct. 1, 2020) (reply brief shall be confined to strictly replying to

arguments presented in appellee's brief).

¶ 70    Finally, we turn to defendant's argument that his 32-year sentence was excessive because it did not reflect relevant mitigating evidence. We note that, as the State observes, defendant has forfeited this issue, as he did not include it in his motion to reconsider sentence. See *People v. Richards*, 2021 IL App (1st) 192154, ¶ 11 (a defendant must raise a sentencing issue in the trial court to preserve the issue for appeal).

¶ 71    "A trial court has broad discretion in sentencing a defendant, and we will not overturn its sentencing decision unless the trial court abuses its discretion. [Citation.] The trial court must consider all applicable factors in aggravation and mitigation, but we will not reverse its decision merely because we would have weighed those factors differently." *People v. Rich*, 2025 IL App (1st) 230818, ¶ 43. A sentence "within the statutory range *** is not excessive unless it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the offense." *Id.* ¶ 44. We must "carefully examine the record, focusing on the court's stated reasons for imposing the sentence." *People v. Murry*, 2025 IL App (1st) 221202, ¶ 119. "We presume that the circuit court considered any mitigating evidence before it, in the absence of some indication to the contrary, other than the sentence itself." *People v. Burton*, 184 Ill. 2d 1, 34 (1998). "To rebut this presumption, a defendant must make an affirmative showing that the sentencing court did not consider the relevant factors." *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48.

¶ 72    Defendant asserts that the trial court did not specifically address certain mitigating evidence including, the sexual abuse he experienced as a child, history of mental illness, abandonment of his father, and enrollment in special education. But the trial court expressly stated that it had considered "all the information contained in the presentence investigative report [and] evidence both in mitigation and aggravation." Further, "[i]t is presumed that the trial judge

considered all of the factors unless the record indicates to the contrary." *People v. Jackson*, 375 Ill. App. 3d 796, 802 (2007). There is no requirement for the trial court to address every mitigating factor. See *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51 ("The trial court is not required to detail precisely for the record the exact process by which it determined the penalty, nor is it required to articulate consideration of mitigating factors.").

¶ 73 Defendant contends that the 32-year sentence was excessive, but it was in the middle of the sentencing range of 10 to 45 years' imprisonment. 730 ILCS 5/5-4.5-25(a) (West 2022) (class X felony, 6-30 years – aggravated battery with a firearm); *id.* § 5-4.5-30(a) (class 1 felony, 4-15 years - aggravated discharge of a firearm); *id.* 5-4.5-35(a) (class 2, 3-7 years – unlawful possession of a weapon by a felon). Given the aggravating factors, a mid-range sentence was not excessive.

¶ 74 III. CONCLUSION

¶ 75 For the reasons stated above, the judgment of the circuit court of Lake Couty is affirmed.

¶ 76 Affirmed.